KIBLER FOWLER & CAVE LLP
Michael D. Kibler (SBN 243982)
mkibler@kfc.law
Matthew J. Cave (SBN 280704)
mcave@kfc.law
Ashley L. King (SBN 322894)
aking@kfc.law
11100 Santa Monica Blvd., Suite 500
Los Angeles, California 90025
Telephone: (310) 409-0400
Facsimile: (310) 409-0401

*Attorneys for Defendants CCC PSC Owner, LLC and CCC TRS, LLC d/b/a Shore Cliff Hotel*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| THE OLD CUSTOM HOUSE, INC.<br><br>Plaintiff,<br><br>v.<br><br>CCC PSC OWNER, LLC, a Delaware limited liability company, and CCC TRS, LLC dba SHORE CLIFF HOTEL, a Delaware limited liability company, and DOES 1 to 30, inclusive,<br><br>Defendants. | CASE NO.<br><br>**DECLARATION OF IAN PULLAN IN SUPPORT OF DEFENDANTS CCC PSC OWNER, LLC AND CCC TRS, LLC dba SHORE CLIFF HOTEL'S NOTICE OF REMOVAL** |

Kibler Fowler & Cave LLP
KF&C
11100 Santa Monica Boulevard
Suite 500
Los Angeles, California 90025

I, Ian Pullan, hereby declare:

1. I am over 18 years of age. I serve as the Vice President of CCC PSC Owner, LLC ("CCC") and as the Vice President of CCC TRS, LLC dba Shore Cliff Hotel ("Shore Cliff") (CCC and Shore Cliff collectively, "Defendants"), each of which is a party in the above-entitled action. The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify thereto.

2. This declaration is made in support of Defendants' Notice of Removal.

3. A true and correct copy of the Complaint (the "Complaint") filed by Plaintiff The Old Custom House, Inc. ("Plaintiff") in the Superior Court of California, County of San Luis Obispo against Defendants and Does 1-30, inclusive, in the action entitled *The Old Custom House, Inc. v. CCS PSC Owner, LLC et al.*, No. 25CV-0546 (filed Aug. 25, 2025) (the "State Action") and served on Defendants' agents for service of process via personal service on September 2, 2025 is attached hereto as **Exhibit A**.

4. To date, none of the remaining Doe Defendants have been substituted with any named defendants or been served with process in the State Action.

5. Other than the filing of the Complaint, no proceedings have taken place in the State Action.

6. As part of my job responsibilities, I know and understand the corporate structure of CCC and Shore Cliff and their operations, including but not limited to their oversight of Plaintiff's operations in the Ventana Grill.

7. CCC is the current owner of the real property located at 2555 and 2575 Price Street, Pismo Beach, California, described as APNs 005-251-006 and 005-261-001 (the "Property"). The Property is improved with, among other improvements, the Shore Cliff Hotel located at 2555 Price Street (the "Hotel") and a two-story, oceanfront building located at 2575 Price Street (the "Restaurant Building").

KF&C Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 500
Los Angeles, California 90025

8. Shore Cliff is an affiliate of CCC, and is the entity vested with operational authority over the Hotel and Restaurant Building pursuant to an intercompany operating lease agreement.

9. CCC is, and was at all times relevant to this action, a limited liability company wholly owned by its sole member CCC MRT Holdings, LLC ("MRT").

10. Shore Cliff is, and was at all times relevant to this action, a limited liability company wholly owned by its sole member CCC TRS Holdings, LLC ("CCC TRS Holdings").

11. As part of my job responsibilities, I know and understand the corporate structure of MRT and CCC TRS Holdings.

12. MRT is, and was at all times relevant to this action, a limited liability company duly organized in the State of Delaware with its principal place of business in the State of Colorado located at 100 Saint Paul Street, Suite 800, Denver, Colorado, 80206.

13. MRT's corporate headquarters are located in the State of Colorado, from which location all of MRT's operations are directed, controlled, and coordinated by its high-level officers.

14. CCC TRS Holdings is, and was at all times relevant to this action, a limited liability company duly organized in the State of Delaware with its principal place of business in the State of Colorado located at 100 Saint Paul Street, Suite 800, Denver, Colorado, 80206.

15. CCC TRS Holdings' corporate headquarters are located in the State of Colorado, from which location all of CCC TRS Holdings' operations are directed, controlled, and coordinated by its high-level officers.

16. A true and correct copy of Plaintiff's Annual Statement of Gross Revenue for the year 2023 is attached hereto as **Exhibit B**.

17. A true and correct copy of Plaintiff's Annual Statement of Gross Revenue for the year 2024 is attached hereto as **Exhibit C.**

KF&C Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 500
Los Angeles, California 90025

18. Upon information and belief, if Plaintiff is permitted to continue operations in the Restaurant Building while the building remains in an unsafe condition, Defendants will potentially incur millions of dollars of damages in the event that there is a sudden collapse of the unstable sea cliff upon which the Ventana Grill is located, as it would result in catastrophic damage to the property and serious injury or death of restaurant patrons and staff.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of September, 2025, at Los Angeles, California.

Ian Pullan
Ian Pullan (Sep 16, 2025 20:53:51 EDT)

Ian Pullan

KF&C Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 500
Los Angeles, California 90025

# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ELECTRONICALLY FILED
8/25/2025 4:51 PM
San Luis Obispo Superior Court
By: *[signature]*
Matthew Zepeda Money, Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
CCC PSC Owner, LLC and CCC TRS, LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
The Old Custom House, Inc.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡**AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

CASE NUMBER: *(Número del Caso):* 25CV-0546

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Luis Obispo Superior Court
1050 Monterey Street
San Luis Obispo, CA 93408

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shae Luchetta 172462 805-548-0770
755 Santa Rosa Street, Suite 300 San Luis Obispo, California 93401

DATE: 8/25/2025 4:51 PM August 25, 2025 /s/Michael Powell Clerk, by *[signature]*, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [XX] on behalf of *(specify):* CCC PSC Owner, LLC, a Delaware limited liability company

under: [ ] CCP 416.10 (corporation) [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
[XX] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*

4. [Y] by personal delivery on *(date):* 9/2/25



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

| SUPERIOR COURT, COUNTY SAN LUIS OBISPO<br>**San Luis Obispo Branch**, 1050 Palm Street, Rm 220, San Luis Obispo, CA 93408<br>**Paso Robles** Branch 901 Park Street, Paso Robles, CA 93446 | |
|---|---|
| **The Old Custom House Inc. vs. CCC PSC Owner, LLC** | **CASE NUMBER**<br>**25CV-0546** |
| | **Case Management Conference** |

8/26/2025

## NOTICE OF ASSIGNMENT AND CASE MANAGEMENT CONFERENCE

This case is assigned to **Judge Craig van Rooyen** for all purposes.

Plaintiff must serve the Summons and Complaint, a copy of this Notice; the Standing Case Management Order (located at https://www.slo.courts.ca.gov/divisions/civil ) of the judge assigned for all purposes and must file proofs of service within 60 days after the Complaint is filed.

**Defendants shall file responsive pleadings with 30 days of service** unless the parties stipulate to an extension of not more than 15 days.

IT IS HEREBY ORDERED:

1. The parties or their attorneys must appear for a first Case Management Conference **on December 29, 2025, 9:00 AM, San Luis Obispo Department 2 either in person or by Zoom.** THE PARTIES OR THEIR ATTORNEYS MUST APPEAR AT THE CASE MANAGEMENT CONFERENCE EITHER IN PERSON OR BY ZOOM. For information regarding remote appearance via Zoom, please see the Court's website https://www.slo.courts.ca.gov/ or the information below.

2. Parties are responsible for reviewing and following the Case Management Order of the Assigned Judge. The orders are located at https://www.slo.courts.ca.gov/os/tentativerulings.htm

3. Each party must file and serve a Case Management Statement at least 15 days before the conference.

4. The person appearing at the first Case Management Conference must be familiar with the case and prepared to discuss suitability of the case for mediation, binding arbitration, judicial arbitration, or some form of alternative dispute resolution.

5. Trial will be set within the 11th or 12th month after the filing of the Complaint. Counsel must arrange their schedules, reserve dates with witnesses and schedule trial preparation with this in mind. Continuances will be granted only on a clear showing of good cause.

6. All law and motion matters will be calendared in the department of the assigned judge and filed with the Clerk's office.

7. Each party should be prepared to show cause why sanctions should not be imposed for a failure to

comply with these rules. **LIMITED JURISDICTION ONLY:** unless the parties have entered into arbitration as required by Local Rules 9.00 and 26.00.

*****If you will be appearing by Zoom, please follow the instructions below.**

**BEFORE** your hearing date:

- Visit www.zoom.us for more information on how Zoom works and how you can join hearings or meetings. Zoom works on computer desktops and most smartphones that are equipped with a camera and microphone. You can download the Zoom application on your device or download the Zoom program if you are using a computer. (www.zoom.us/download). You **do not** need to create a Zoom account in order to participate in the Zoom hearing.
- **Name your device with your legal name.**
  - ✓ **For Android users: Tap the following sequence: Settings> Quick settings> About device> Device name.**
  - ✓ **For iPhone users: go to Settings> General, then tap About; Tap Name and rename your device.**
- Test the Zoom **audio** and **video** functions on your device **before** your hearing.
- Visit https:/zoom.us/test for more information on how to test your device.

**ON** your hearing date:

- Log onto Zoom through your internet browser or through the application on your mobile device. To join the hearing, click on "**Join A Meeting**" and enter the "Meeting ID" and "Meeting Password". Here is the Zoom information for your court appearance:

  **MEETING ID: 160 700 6555**

  **PASSWORD: 79513**

- You may also access the Zoom information from the Court's website at: https://www.slo.courts.ca.gov
- Click on "Remote Court Appearances via Zoom" and locate the Department you are to appear in. Click on "Join Zoom Meeting."
- If you don't have a camera on your remote device, you can still participate by phone.
  - ➢ Call: 1 (669) 254-5252; use the same Meeting ID and Password as above.
- Upon joining the meeting, you will be placed in a **"WAITING ROOM."** When the Court is ready to start the hearing, the Court will move you from the waiting room into the meeting.

- **Parties participation in Zoom hearings:**
  - ➢ **Shall** display their legal name on the video conferencing screen;
  - ➢ **Shall be** dressed appropriately and **shall not** wear sunglasses or hats;
  - ➢ **Shall** participate in the remote appearance with the same degree of courtesy, decorum, use of appropriate language, and courtroom etiquette as required for a personal courtroom appearance.
  - ➢ **Shall be** separate from witnesses (outside of each other's view and earshot)
    - ✓ **Shall not** record the Zoom meeting [California Rule of Court rule 1.150 (c) & (d)]; and,
    - ✓ **Shall not** share their screens or give the Zoom meeting ID and/or password to anyone other than a party to the case, an attorney for a party, or a witness who will be called to testify at the hearing.

**<u>EXHIBITS</u>** – If you want to present evidence to the Court, please follow the instructions below. **ALL EXHIBITS MUST BE PRESENTED TO THE COURT AND THE ALL THE PARTIES <u>AT LEAST 5 DAYS</u> PRIOR TO THE HEARING.**

- Print your exhibits, place them in a binder, submit the binder or place the binder into one of the two drop boxes outside the San Luis Obispo Courthouse. If the exhibits are too large for the drop box, drop them off inside the Courthouse at Jury Services, on the second floor.
- You may e-file your exhibits with the Court; however hard copy in a binder are **required** to be dropped off prior to your hearing. For more information, go here: http://www.odysseyefileca.com/

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: 172462
Shae Luchetta
Luchetta Law PC
755 Santa Rosa Street, Suite 300 San Luis Obispo, California 93401
TELEPHONE NO.: 805-548-0770 FAX NO.:
EMAIL ADDRESS: shae@luchettalaw.com
ATTORNEY FOR *(Name)*: The Old Custom House, Inc.

*FOR COURT USE ONLY*

**ELECTRONICALLY FILED**
**8/25/2025 4:51 PM**
San Luis Obispo Superior Court
By: [signature] Matthew Zepeda Money, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Luis Obispo
STREET ADDRESS: 1050 Monterey Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Luis Obispo, CA 93408
BRANCH NAME: San Luis Obispo

CASE NAME:
The Old Custom House, Inc. v. CCC PSC Owner, LLC and CCC TRS, LLC

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: 25CV-0546 |
|---|---|---|---|
| [X] **Unlimited** (Amount demanded exceeds $35,000) | [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: 3
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 25, 2025
Shae Luchetta
(TYPE OR PRINT NAME)
▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller
    - Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

ELECTRONICALLY FILED
8/25/2025 4:51 PM
San Luis Obispo Superior Court
By: Matthew Zepeda Money, Deputy Clerk

SHAE LUCHETTA, SBN 172462
LUCHETTA LAW PC
755 Santa Rosa Street, Suite 300
San Luis Obispo, CA 93401

(805) 548-0770

Email: shae@luchettalaw.com

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN LUIS OBISPO

| | |
|---|---|
| The Old Custom House, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>CCC PSC Owner, LLC, a Delaware limited liability company; CCC TRS, LLC, dba Shore Cliff Hotel, a Delaware limited liability company, and DOES 1 to 30, inclusive,<br><br>Defendant. | CASE NO. 25CV-0546<br><br>**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF** |

Plaintiff The Old Custom House, Inc. ("Plaintiff"), complains, alleges and seeks relief as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff is a corporation organized and existing in the State of California with its principal place of business in the City of Grover Beach, State of California, and the County of San Luis Obispo.

2. Plaintiff is informed and believes and based thereon alleges that CCC PSC Owner, LLC ("CCC") is a Delaware limited liability company owning real property located at 2555 and 2575 Price Street, Pismo Beach, in the County of San Luis Obispo, State of California ("Property"). The Property is improved with, among other improvements, the Shore Cliff Hotel located at 2555 Price Street ("Hotel") and a two-story, ocean front building and adjacent portico structure located at 2575 Price Street ("Restaurant Building").

3. Plaintiff is informed and believes and based thereon alleges that CCC TRS, LLC ("TRS") is a Delaware limited liability company, an affiliate of CCC, and is vested with operational authority over the Hotel and Restaurant Building in the City of Pismo Beach, County of San Luis Obispo, State of California.

4. The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff is informed and believes and upon said information and belief alleges that each of the Defendants sued herein under fictitious names are negligently, intentionally, strictly, or vicariously liable and/or otherwise legally responsible in some manner for each and every act, omission, obligation, event or happening set forth in the Complaint. Plaintiff will seek leave of court to amend its Complaint to show the true names and capacities of said DOE Defendants when the same have been ascertained.

5. The use of the term "Defendants" in any of the allegations set forth in this Complaint, unless specifically otherwise stated, is intended to include and charge, both jointly and severally, not only named Defendants, but all Defendants designated as DOES 1 through 20, inclusive, as though the term "Defendants" was followed in each and every instance throughout this Complaint by the phrase "and each of them jointly and severally, including all named Defendants and all Defendants included herein sued under the fictitious names of DOES 1 through 20, inclusive."

6. Plaintiff is informed and believes and upon said information and belief alleges that Defendants DOES 1 through 20, inclusive, were at times relevant herein, residents of the County of San Luis Obispo, California and/or are corporations, partnerships, associations, and/or individuals duly qualified and/or authorized to do business in the County of San Luis Obispo, California.

7. The Superior Court of the County of San Luis Obispo is a proper venue and jurisdiction for this action as it is the location of the real property leased to Plaintiff and where the lease agreement described below was to be performed.

**FIRST CAUSE OF ACTION**

**FOR BREACH OF CONTRACT**

**(Against Defendants CCC, TRS and DOES 1-10)**

8. Plaintiff realleges and incorporates by this reference, as fully set forth herein, each and every allegation as set forth in paragraphs 1 through 7 above.

9. On or about July 12, 2012, Plaintiff and Defendants' predecessor-in-interest, Martin Hotel Management, LLC, entered a long-term Lease Agreement ("Agreement") dated July 1, 2012 to be performed in the County of San Luis Obispo providing for the lease of the Restaurant Building to Plaintiff for the purposes of operating a food and beverage business under the name Ventana Grill consisting of a restaurant, bar, banquet and catering services business at the Restaurant Building. A true and correct copy of the Agreement is attached hereto as Exhibit A.

10. Plaintiff is informed and believes, and base thereon alleges that on or about February 1, 2023, CCC acquired the Property – including the Hotel and Restaurant Building and became the successor owner and Lessor as defined in the Agreement. (Ex. A - Agreement, ¶ 28.) The Agreement includes six automatic renewals of 5 years each. (Ex. A - Agreement, ¶ 2.)

11. Since execution of the Agreement, Plaintiff performed all or substantially all of its obligations under the Agreement.

12. Commencing in July 2025, Defendants breached the Agreement by contacting Plaintiff and repeatedly demanding Plaintiff immediately shut down all operations at the Restaurant Building, claiming each of the Defendants have an independent and unilateral right to terminate the Lease.

13. On or about August 18, 2018, Defendants breached the Agreement again by demanding Plaintiff immediately shut down all operations at the Restaurant Property and serving a 10-day notice to perform covenant or quit threatening to commence litigation if Plaintiff did not cease all operations within the 10-day period.

14. Plaintiff is informed and believes and based thereon alleges that Defendants have no right to terminate the Agreement and Defendants' alleged basis for terminating the Agreement is a

nothing more than a contrived excuse to terminate Plaintiff's tenancy in direct breach of the Agreement.

15. As a direct and proximate result of Defendants' breaches of the Agreement, Plaintiff has suffered damages of $70,000.00.

Wherefore, Plaintiff prays for judgment as set forth below.

**SECOND CAUSE OF ACTION**

**FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants CCC, TRS and DOES 1-10)**

16. Plaintiff realleges and incorporates by this reference, as fully set forth herein, each and every allegation as set forth in paragraphs 1 through 15 above.

17. In every contract made in California, there is an implied covenant that no party to the contract will do anything to prevent the other party to the contract from realizing the benefits of the contract.

18. In doing or failing to do the things alleged above, Defendants breached the covenant of good faith and fair dealing implied in the Agreement causing injury and loss to Plaintiff and giving rise to the remedies claimed herein.

Wherefore Plaintiff prays for judgment as set forth below.

**THIRD CAUSE OF ACTION**

**FOR DECLARATORY RELIEF**

**(Against Defendants CCC, TRS and DOES 8-20)**

19. Plaintiff realleges and incorporates by this reference, as fully set forth herein, each and every allegation as set forth in paragraphs 1 through 15 above.

20. An actual controversy has arisen and now exists between Plaintiff on the one hand, and Defendants on the other, concerning their respective rights and duties in that Plaintiff contends that Defendants have contrived a false concern in an attempt to justify the termination of the Agreement and destroy Plaintiff's business when in reality, Defendants want to terminate the Agreement to increase their income from the Restaurant Building that are subject to the long-term

lease Plaintiff and Defendant's predecessor entered over a decade ago. Plaintiff is informed and believes that Defendants assert the opposite is true.

21. Plaintiff desires a judicial determination of its rights under the Lease, and a declaration that Plaintiff is the Lessee entitled to possession of the Premises and Defendant has no rights to terminate the Lease.

22. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain its rights as alleged herein. Plaintiff will continue to suffer the above-described harm unless and until such declaration is made.

23. By their words and actions, Defendants have threatened to cause Plaintiff irreparable harm by forcing Plaintiff to immediately shut down its business. The Restaurant Building is unique as it is located immediately adjacent to the Pacific Ocean in Pismo Beach and it would be nearly impossible to replace it with a similarly situated building that Plaintiff could occupy for the next two decades. In addition, Plaintiff's business is associated with the unique location of the Restaurant Building and Plaintiff's loss of this location would cause a significant loss of Plaintiff's goodwill, which is likely to cause the ruin of Plaintiff's business. Plaintiff is entitled to a preliminary injunction ancillary to his claim for declaratory relief to prohibit Defendants' threatening conduct pending the Court's issuance of the requested judicial declaration.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## PRAYER

Plaintiff prays for relief as follows:

**On the First and Second Causes of Action**

1. For general and special damages in an amount of $70,000.00;

2. For an award of prejudgment interest and cost of suit;

3. For an award of reasonable attorneys' fees;

4. For costs of suit.

**On the Third Cause of Action**

1. For preliminary injunctive relief ancillary to Plaintiff's claims for declaratory relief;

2. For a declaration that the Agreement is valid and in full force and that Defendants have no valid basis to terminate the Agreement or to demand Plaintiff immediately cease operations at the Restaurant Building.

**On all Causes of Action**

1. For such other and further relief as may be just and proper.

Dated: August 25, 2025

LUCHETTA LAW PC
SHAE LUCHETTA

By: *Shae Luchetta*
Shae Luchetta
Attorneys for Plaintiff
The Old Custom House, Inc.

# LEASE AGREEMENT

THIS LEASE AGREEMENT ("Agreement"), dated for reference purposes only as of July 1, 2012, is entered into between Martin Hotel Management, LLC, a Delaware Limited liability company ("Landlord"), and, The Old Custom House, Inc., a California corporation ("Tenant")

## Recitals

A. Landlord owns property located at 2555 and 2575 Price St. in Pismo Beach, California, described as APN's 005-251-006 and 005-261-001 (the "Real Property"). Tenant currently operates a food and beverage business consisting of a restaurant (under the name "Ventana Grill"), bar, banquet and catering services business at the restaurant building (collectively the "Premises"). Tenant's operations at the Premises are sometimes referred to herein as the "F&B Operation".

B. Landlord operates the Shore Cliff Lodge hotel on the Real Property (the "Hotel") which includes the operation of a gazebo used for weddings and special events (the "Gazebo"),

C. Tenant desires to lease and to assume all responsibility for management and control of the Premises per the terms and conditions as set forth herein.

NOW, THEREFORE, the parties have agreed as follows:

1. PREMISES. Landlord hereby leases to Tenant those certain premises located on a portion of the Real Property which include the existing restaurant building and. the adjacent portico structure, which includes a dining room, banquet meeting rooms, kitchen and kitchen storage facilities, bar, and lobby/lounge area as are depicted on Exhibit "A" attached hereto in more detail, (collectively, the "Premises"). Tenant hereby acknowledges that: (a) Tenant has occupied the Premises since September 1, 2009 and is readily familiar with all aspects of the Premises as they now exist; (b) Tenant has thoroughly inspected the Premises,: (c) Tenant accepts the Premises on an "AS-IS" basis; (c) neither Landlord nor any of the Landlord's agents or representatives have made any warranty or representation with respect to the Premises, or Tenant's use of the Premises, including but not limited to warranties regarding the square footage of the Premises; and, (d) by entering into this Agreement, Tenant waives the provisions of Sections 1932, 1942 and 1942 of the California Civil Code. The existing fixtures and equipment at the Premises (the "Landlord's Personal Property") shall be leased to Tenant as part of the Premises, but title to such Landlord's Personal Property shall remain with Landlord at all times. In addition to the Premises, during the Term, Tenant shall likewise have the nonexclusive right to use the driveway and parking areas shown on Exhibit "A" (the "Common Area Parking") for ingress and egress, roadway, sidewalk, and automobile parking, provided that such use is in accordance with the terms and rules set forth on Exhibit "B" hereto regarding employee parking, and Tenant, in the use of the Common Area Parking areas, agrees to comply with the reasonable rules and regulations as Landlord may hereafter adopt, in Landlord's reasonable discretion, from time to time for the orderly and proper operation of the Common Area Parking areas. The Common Area Parking areas, for purposes of this lease, shall include the fencing adjacent to said parking areas.

2. TERM: AUTOMATIC EXTENSION. This lease shall be for an initial term of thirty-eight (38) months commencing on July 1, 2012 ("Commencement Date") and shall end on August 31, 2015 (the "Initial Term," and including any Extension Terms (as defined below, the "Term") per the terms and conditions set forth in this provision . Unless Tenant delivers a written "Notice to Terminate Lease" to the Landlord at least one hundred eighty (180) calendar days before the expiration of any operative term but not before two hundred seventy (270) calendar days before the expiration of any operative term, this Agreement shall automatically renew for up to six (6) additional periods of five (5) years (the "Extension Terms"), provided, however, that the Agreement shall not renew without the express written permission of Landlord if Tenant is in default under the lease at the end of the then current operative term. Except for this provision governing automatic extensions, which shall be limited to a maximum of six (6) additional periods of five (5) years each, all other terms and conditions of this Agreement shall apply to the Extension Terms, if any, except as otherwise herein specified. Upon the expiration or earlier termination of this Agreement, Tenant shall return the Premises and the Landlord's Personal Property to Landlord in the same condition as existed on the Commencement Date, reasonable wear and tear expected.

3. RENTALS.

3.1 *Base Rent.* Tenant shall pay to Landlord, in advance without offset, adjustment or abatement, minimum monthly base rent of $10,500.00 per month for the leased Premises for each and every month during the Term of this Agreement on or before the fifteenth (15) day of each month for that calendar month ("Base Rent").

*3.2 Percentage Rent.* In addition to the Base Rent due hereunder, Tenant shall additionally pay Landlord the difference between the Base Rent due hereunder and the amount equal to 6% of the Tenant's monthly Gross Revenue (as defined below),

*3.3 Adjustments to Base Rent.* Commencing on June 1, 2013, and on the anniversary of that same date (the "Adjustment Date") during each subsequent year of the Term of this Agreement, including all Extension Terms, the Base Rent shall be increased to an amount equal to the Base Rent, multiplied by a fraction, the numerator of which is the Index for the second calendar month (April) immediately preceding the Adjustment Date, and the denominator which is the Index for the month of April 2012 (denominator Index = 236.866). Notwithstanding Index fluctuations to the contrary, on any Adjustment Date there shall always be a minimum increase in Base Rent due hereunder of three percent (3%) and a maximum increase of five percent (5%) . Rent shall never be decreased on an Adjustment Date. Index Defined. The term "Index" as used in this Agreement shall mean the Consumer Price Index for "All Items", "All Urban Consumers", (1982-84=100) for the Los Angeles-Riverside-Orange County, CA, Area, published by the United States Department of Labor, Bureau of Labor Statistics. If the Bureau of Labor Statistics revises the Index, the parties agree that the Bureau of Labor Statistics will be the sole judge of the comparability of successive indexes. If that agency, however, fails to supply indexes that it deems comparable, or if no succeeding index is published, the Landlord shall choose an appropriate alternative Federal or State government published price index.

*3.4 Percentage Rent.* Tenant agrees to pay to Landlord as additional rent for each month during the Initial Term and Extension Terms, if any subject to adjustment as described in Section 2 above, a sum equal to six percent (6%) of Tenant's monthly Adjusted Gross Revenues from the F&B Operation conducted in and from the Premises in such month, computed as hereinafter provided. Monthly percentage rent due under this Section 3.4 is only the amount that the calculated

percentage rent exceeds the monthly Base Rent for that specific month (delineated in Section 3.1 and adjusted by Section 3.3).

*3.5 Definition of Gross Revenues.* The term "gross revenues" as used in this Agreement, shall mean the gross amount of revenues received by Tenant whether for cash, credit, check or charge account (whether payment is actually received for sales or credit or not) or other form of payment, from all sales of food, beverages, merchandise, services, banquet and meeting room charges, if any, and from income from all other sources derived from business conducted on or from the Premises as well as off-premises sales activities (so long as said "off-premises" sales activities are derived from business conducted on or from the Premises) (collectively, the "Gross Revenues"). Notwithstanding the foregoing, Landlord acknowledges that Tenant plans to centralize scheduling its banquet and catering services for all of Tenant's other sites out of the Premises and agrees that any income received by Tenant from services provided to or by Tenant's other sites shall not be included in calculating the Gross Revenues.

*3.6 Deductions from Gross Revenues.* There shall be excepted from Tenant's Gross Revenues in the determination of Adjusted Gross Revenues: (a) the amount of all sales, excise or other taxes imposed by a governmental body, whether such taxes are separately added to, or included in the selling price; (b) insurance proceeds from casualty and business losses, except for business interruption insurance or other insurance to the extent that such insurance compensates Tenant for loss of business revenues; (c) tips for employees; (d) the amount of any actual refunds or credits made by Tenant for returned merchandise, the amount of which had previously been included in Tenant's Gross Revenues; (e) promotional or charity meals to the extent no charge was made therefore; (f) amounts received for employee meals sold at discount to employees, not to exceed two percent (2%) of Tenant's Gross Revenues; (g) VIP and general discounts; and (h) rental fees paid to Landlord for use of the Gazebo space of the Hotel.

*3.7 Accounting.* Tenant shall keep or cause to be kept, full, complete, and proper books, records and accounts of the gross revenues and deductions of each separate department and concession at any time operated in or from the Premises; including any sales tax reports that Tenant may be required to furnish to any governmental agency (collectively the "Financial Records"), said Financial Records shall at all reasonable times and upon reasonable notice be open to the inspection of Landlord, Landlord's auditor or other authorized representative or agent.

*3.8 Percentage Rent Payments/Reporting.* On or before the fifteenth (15th) day of each calendar month during the Term, Tenant shall prepare and deliver to Landlord at the place designated by Landlord from time to time a monthly statement of the Adjusted Gross Revenues made during the preceding calendar month. At such time, Tenant shall pay to Landlord an amount equal to 6% of Tenant's Adjusted Gross Revenues for the prior month less the Base Rent paid for that prior month. In addition, within thirty (30) days after the expiration of each lease year and within ninety (90) days after the termination of this Agreement if this Agreement should not terminate at the end of a lease year, Tenant shall prepare and deliver to landlord at the place designated by Landlord an annual statement of Adjusted Gross Revenues during the preceding lease year certified to be correct by Tenant. Such statements shall be in such form as Landlord may reasonably require, and are subject to Section 3.9 below. As used herein, a "lease year" shall mean each twelve month period ending on December 31, with the first lease "year" consisting of the seven month period ending on December 31, 2012.

*3.9 Audit.* At Landlord's expense, Landlord may cause at any reasonable time upon fifteen (15) days prior notice to Tenant a complete audit to be made of Tenant's Financial Records

relating to Adjusted Gross Revenues for the period covered by any monthly or annual statement issued by Tenant pursuant to this Agreement; provided, however, that if such Financial Records are found to be incorrect to the extent they reflect an understatement or unreported Adjusted Gross Revenues of five-percent (5%) or more over the Adjusted Gross Revenue figure as submitted by Tenant, Tenant shall pay and reimburse Landlord for the costs of such audit. Tenant shall promptly pay to Landlord any deficiency in unpaid percentage rents disclosed by any such audit, or Landlord shall promptly refund to tenant any overpayment in such percentage rents, as the case may be, which is established by such audit. Landlord shall only have the right to audit Tenant's books and records with respect to annual adjusted Gross Revenues once per lease year.

*3.10 Gazebo Rent.* Landlord also owns an area that is not part of the Premises that are leased hereunder, hereinafter the "Gazebo Site" as shown on Exhibit "C". The Gazebo Site is the lawn area extending between the Hotel building and the Pacific Ocean and the Gazebo structure currently located thereupon. Tenant will pay monthly, together with the Percentage Rents delineated in Section 3.2 above, the agreed upon Gazebo Site Rent for the Tenant's use of the Gazebo Site during the term of this lease as additional rent due hereunder. The initial Gazebo Site Rents schedule is set forth in Exhibit "D." and such rents are based upon each use by Tenant of the Gazebo Site, which use, exclusive of reasonable set-up and take-down periods, shall never exceed two (2) hours in duration; and shall be further limited to two (2) uses per day between the hours of 11:00 a.m. and 6:00 p.m.. Gazebo Site Rent shall be adjusted annually during the term of this lease, on the Base Rent Adjustment Dates and in accordance with the same formula set forth in Section 3.3 for the adjustment of Base Rent due hereunder. Tenant shall notify Landlord, in writing, at least thirty (30) days prior to any scheduled use by Tenant of the Gazebo Site, upon which the Tenant has received a deposit towards, and shall always use the Gazebo Site in a fashion which does not unreasonably interfere with the Landlord's Hotel operations, or the guests at the Hotel. Tenant shall not schedule the use of the Gazebo Site, nor accept deposits for the same, for any planned use for which Landlord has not received at least thirty (30) days advance written notice without first obtaining Landlord's prior written consent for the same, which consent shall not be unreasonably withheld by Landlord. Landlord shall have the right to withhold Landlord's consent to Tenant's request to use the Gazebo Site without thirty (30) days advance notice hereunder for: (i) any reasonable commercial purpose, or (ii) any circumstance reasonably associated with the Landlord's operation of the Hotel. Additionally Landlord shall have the right to terminate Tenant's right to utilize the Gazebo Site hereunder for: (x) any reason which may arise or otherwise be directly associated with the rules, regulations or enactments of any governmental authority having jurisdiction over the same which prohibits Tenant's planned use, (y) if the planned use creates an unreasonable risk to human life or limb as a result of any force majeure, or (z) if the Gazebo structure is uninhabitable as a result of damage or destruction.

*3.11 Miscellaneous.* All amounts of rent shall be payable in lawful money of the United States of America. If rent is not paid within ten (10) days of the due date set forth herein, Tenant shall pay a late charge equal to five percent (5%) of the amount due. The parties acknowledge that it would be impracticable and extremely difficult to fix Landlord's actual damage in the event of a late payment by Tenant, and agree that the late charge specified above represents a reasonable estimate of the damage incurred.

*4* PERMITTED USES: OPERATION OF BUSINSESS. Tenant shall use the Premises to conduct a restaurant, bar, banquet/meeting and related food and beverage operation at the restaurant under the name "Ventana Grill" or as may otherwise be hereafter agreed to by the parties, in writing, and for no other purpose. Tenant shall continuously during the entire Term of this Agreement operate said business on and from the Premises with due diligence and efficiency as to reasonably produce the maximum return and to comply strictly with the terms and conditions of this

Agreement. Tenant shall conform strictly to the operating rules and regulations set out on Exhibit "B" attached hereto and incorporated herein by this reference in the conduct and operation of Tenant's F&B Operations.

4.1 Tenant shall be obligated to reimburse Landlord, as additional rent due hereunder, for any increase in premiums payable and/or due based upon an increase in insurance coverage required by Landlord for Landlord's fire and extended coverage insurance for the Premises, if such increase is attributable to any particular use or activity engaged in by Tenant at the Premises, including but not limited to, the installation, operation and use of Tenant's possessions, or if such increase is caused by improvements or utility installations required or requested by Tenant for any of Tenant's possessions. Landlord shall have the right, in Landlord's reasonable discretion, to determine the necessity for any increase in such insurance coverage.

5. PROHIBITED USES. Tenant shall not do or permit anything to be done in or about the Premises, nor bring or keep anything therein which will in any way increase or affect the rates on any existing fire or other insurance upon the premises or cause a cancellation of any insurance policy covering the Premises or any part thereof or any of its contents, without the prior written consent of Landlord. Tenant shall not commit, or allow to be committed, any nuisance or waste in or upon the Premises. Tenant shall not use the Premises, or permit anything to be done in or about the Premise, which will in any way conflict with any law, statue, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated.

5.1 Tenant shall not cause or permit any Hazardous Substance, as defined below, to be brought upon, kept, or used in or about the Premises by tenant or Tenant's agents, employees, contractors, or invitees without the prior written consent of Landlord, which Landlord shall not unreasonably withhold as long as Tenant demonstrates to Landlord's reasonable satisfaction that such hazardous Substance is necessary or useful to Tenant's business and will be used, kept, and stored in a manner that complies with all laws regulating any Hazardous Substance, and provided further that Tenant agrees, in writing, to hold Landlord harmless and fully indemnify Landlord from any and all liability, costs and expenses associated with the presence of such Hazardous Substance at the Premises. The term "Hazardous Substance" as used in this Agreement shall mean any product, substance, chemical, material, or waste whose presence, nature, quantity and/or intensity of existence, use, manufacture, disposal, transportation, spill, release, or effect, either by itself or in combination with other material expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises; (ii) regulated or monitored by any governmental authority; or (iii) a basis for liability of Landlord to any third party or entity.

5.2 Tenant shall not cause or permit any Hazardous Substance to be spilled or released in, on, under or about the Premises (including through the plumbing or sanitary sewer system), and shall promptly, at Tenant's sole cost and expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the clean-up of any Hazard Substance contamination caused by Tenant and/or Tenant's agents, employees, invitees or authorized representatives (collectively the "Tenant Parties"), and for the maintenance, security, and/or monitoring of the Premises, the elements surrounding the Premises, or neighboring properties, that was caused or materially contributed to by the Tenant or the Tenant Parties, or pertaining to or involving any Hazardous Substance and/or storage tank brought to the Premises by or for Tenant, the Tenant Parties or any other person or entity under Tenant's control.

5.3 If Tenant knows, or has reasonable cause to believe, that a Hazardous

Substance, or a condition involving or resulting from the same, has come to be located in, on, under, or about the Premises, whether or not previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord. Tenant shall also immediately give Landlord a copy of any statement, report, notice, registration, application, permit, business plan, license, claim, action, or proceeding given to, or received from, any governmental authority or private party, or persons entering or occupying the Premises, concerning the presence, spill, release, discharge of or exposure to, any Hazardous Substance or contamination in, on under, or about the Premises.

5.4 Tenant shall indemnify, protect, defend, and hold Landlord, Landlord's agent, and the Premises, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, costs, claims, liens, expenses, penalties, permits, and attorneys' and consultants' fees arising out of or involving any Hazardous Substances brought onto the premises by or for Tenant, the Tenant Parties, or by any person or entity under Tenant's control. Tenant's obligations hereunder shall include, but not be limited to the effects of any contamination or injury to person, property, or the environment created or suffered by Tenant, and the cost of investigation (including consultants' and attorneys' fees and testing), removal, remediation, restoration, and/or abatement thereof, or of any contamination therein involved, and shall survive the expiration or earlier termination of this Agreement so long as the operative Hazardous Substance can definitively be linked to Tenant or Tenant's agents, employees, customers or vendors (e.g., said Hazardous Substance was brought by Tenant or Tenant's authorized agent or employee to the premises during the time this Agreement was valid and binding). No termination, cancellation or release agreement entered into by Landlord and Tenant shall release Tenant from its obligation under this Agreement with respect to Hazardous Substances, unless specifically so agreed by Landlord, in writing, at the time of such agreement.

6. ALTERATIONS. Tenant shall not make, or permit to be made, any alterations, additions or improvements to or of the Premises or any part thereof, except with the prior written consent of the Landlord, which consent shall not be unreasonably withheld. Under no circumstances will any alternation to the Premises be made which increases the drainage from the Permises, or otherwise might contribute to or cause the deterioration of the bluff area below the Premises.

7. LIENS. Tenant shall keep the Premises, and the property on which the Premises are situated, free from any liens arising out of any work permitted by, materials furnished to or obligations incurred by Tenant.

8. ASSIGNMENT AND SUBLETTING. Tenant shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise encumber all or any part of Tenant's leasehold interest in the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld provided the proposed assignee or sublessee is, in Landlord's reasonable opinion: (a) financially capable of meeting all obligations of the lease, and provides adequate financial information to support that conclusion; and, (b) a business compatible with Landlord's Hotel operations on the Real Property; and further provided that such assignee or sublessee executes a written agreement with Landlord that they will be bound by all terms of this agreement. Any attempted assignment, transfer, mortgage, subletting or encumbrance without said prior written consent shall be voidable by Landlord and, at Landlord's election, shall constitute a material default under this agreement.

If Tenant is a partnership or limited liability company, a withdrawal or change, voluntary, involuntary or by operation of law of any partner or member, or the dissolution of the partnership or limited liability company, shall be deemed an assignment hereunder. If Tenant consists of more than one person, any purported assignment, voluntary, involuntary, or by operation of law, from one such

Tenant to any other Tenant or person shall be deemed an assignment hereunder. If Tenant is a corporation, any dissolution, merger, consolidation or other reorganization of Tenant, or the sale or transfer of a controlling percentage of the capital stock of Tenant, or the sale of 51% or more of the value of assets of Tenant, shall be deemed an assignment hereunder. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least 51% of the combined voting power of all classes of Tenant's capital stock issued, outstanding and entitled to vote for the election of directors.. This restriction on corporate Tenants shall not apply to a corporation if its stock is traded through an exchange or over the counter.

This acceptance of rent by Landlord from any other party shall not be deemed to be a waiver by Landlord of any provision hereof. Consent to one assignment or subletting shall not be deemed consent to subsequent assignment or subletting. In the event of a default by any assignee or sublessee of Tenant in the performance of any of the terms hereof, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against said assignee or sublessee.

Notwithstanding the language of this provision, if Tenant makes any assignment of Tenant's entire interest under this agreement to any third party or unrelated entity, with Landlord's prior written consent, within Landlord's reasonable discretion, then the assigning Tenant shall be absolved of any and all liability thereafter arising under this Agreement, including any liability arising from the actions of the assignee, from the effective date of the assignment so approved by Landlord, but in no event shall Tenant be released from liabilities arising hereunder prior to the date of the assignment, even if such liabilities are not discovered until after the date of the assignment.

9. <u>WAIVER OF CLAIMS</u>. Landlord shall not be liable to Tenant, and Tenant hereby waives all claims against the Landlord, for any injury or damage to any person or property in or about the Premises, unless such injury or damage arises out of or as a result of a breach of Landlord's maintenance obligations under Section 15 below or Landlord's gross negligence.

10. <u>INSTALLATION AND USE OF TENANT'S EQUIPMENT ON THE PREMISES, EROSION AVOIDANCE</u>. No equipment, machinery, apparatus or other appliance shall be used or operated on the Premises in such a manner that such equipment will in any way injure, vibrate or shake the Premises, or place an excessive burden on the Premises structure. Additionally, Tenant acknowledges and agrees that Tenant's use of the Premises shall at all time be conducted in a fashion so as to avoid any actions or omissions which contribute in any form or fashion to any erosion of the bluff areas adjacent to, or beneath the Premises, and that any failure of the Tenant to comply with this obligation shall be deemed a material breach of this lease agreement.

11. <u>HOLD HARMLESS</u>. Except to the extent of Landlord's gross negligence or willful misconduct, Tenant shall indemnify and hold Landlord harmless from, and shall indemnify and defend Landlord against, any and all claims, loss of rents and/or damages liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant. Tenant's hold harmless and indemnity obligations to Landlord hereunder shall include damages resulting from the use or operation of Tenant's business and possessions, including, but not limited to, furniture, fixtures, equipment and inventory on or at the Premises.. Tenant's hold harmless and indemnity to Landlord shall also extend to any damages or claims arising from Tenant's breach of any of the Tenant's obligations hereunder. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by mutually agreed upon counsel and Landlord shall cooperate with Tenant in such defense, at no cost or expense to Landlord. Landlord

need not have first paid any such claim in order to be defended or indemnified.

12. INSURANCE. Tenant, at its cost, shall maintain during the Term of this Agreement on all of its possessions, improvements, and alterations in or about the Premises, a policy of standard fire and extended coverage insurance with vandalism and malicious mischief endorsements, and with an endorsement covering all plate glass and windows located in or about the Premises, to be in the extent of their full replace value. The proceeds from any such policy shall be used by Tenant for the replacement of Tenant's possessions, the restoration of Tenant's improvements or alterations, and/or the replace of plate glass or windows.

Tenant, at its sole cost and expense, shall also maintain during the Term, comprehensive general liability and property damage insurance with a combined single limit of Three Million Dollars ($3,000,000.00) for bodily injury and property damage, insuring Landlord and Tenant against all liability arising out of and in connection with Tenant's use or occupancy of the Premises and Tenant's use of Tenant's possessions on or about the Premises. Said insurance shall also insure performance by Tenant of the hold harmless and indemnity provisions in Section 11, above, but the limits of such insurance shall not serve to limit the liability of Tenant hereunder. On or before the commencement of the Term of this Agreement, Tenant shall supply Landlord with certificate(s) evidencing the insurance coverage required hereunder. Said certificate shall name Landlord as an additional insured and shall expressly provide that the policy(ies) evidenced by the certificate may not be cancelled or altered without thirty (30) day' prior written notice to Landlord ( or ten (10) days in the event of nonpayment of premiums). Tenant shall provide Landlord with current certificate(s) of insurance prior to the expiration of any policy required hereunder. Within thirty (30) days prior to the commencement of any Extension Term, Landlord shall have the right to increase the amount of insurance to be carried by Tenant hereunder to an amount and on terms which reflect market conditions for similar leasehold premises in the local geographic area. If Tenant is unable to acquire the additional insurance at commercially reasonable rates, Tenant may at its sole discretion terminate this lease, unless Landlord, by separate writing, waives its right to require such increase.

Tenant shall also maintain worker's compensation insurance in compliance with statutory limits.

13. WAIVER OF SUBROGATION. Tenant and Landlord each release the other and waive the entire right of recovery against the other for loss or damage arising out of or incident to the perils insured against, which perils occur in, on, or about the premises, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors, or invitees. Tenant and Landlord shall, upon obtaining the required policies of insurance, give notice to the insurance carriers that this mutual waiver of subrogation is in this Agreement.

14. UTILITIES AND SERVICES.

14.1 Tenant shall pay for all gas, electricity, heat, light, power, telephone, water, sewer and all other services and utilities supplied to, or utilized by Tenant at the Premises. To the extent such utilities are separately metered, Tenant shall pay such bills directly to the provider. If Landlord is required to construct new or additional utility installations, including without limitation, wiring, plumbing, conduits, mains or meters, as a result of Tenant's use of the Premises or Tenant's installation of equipment or fixtures thereon, Tenant, on demand, shall pay to Landlord the total cost of such additional utility installations. Landlord shall not be responsible for any power outages or interruptions in the delivery or use of utilities and services to the Premises, or for any damage to Tenant's equipment or fixtures as a result thereof. In the case of such an outage or interruption,

involving any common systems or un-metered services which are not a result of the acts or omissions of Tenant hereunder, Landlord shall take all reasonable steps to restore the interrupted utilities or services, but shall not be responsible for any delays in restoring service. Tenant shall be solely responsible for outage and interruptions of such services which occur as a result of Tenant's acts or omissions, or arising from the acts or omissions of Tenant Parties, or the Tenant's invitees or customers Landlord makes no representations or warranties regarding the continued availability of water, utilities or other services to the Premises.

14.2 Grease Trap, Sewer Lift and Clean Out(s): The property upon which the Premises is located is currently subject to a mandatory quarterly cleaning cycle by the City of Pismo Beach. Tenant acknowledges and agrees that Tenant shall contract for and perform regular maintenance and the quarterly cleaning of: (a) the grease trap (the "Grease Trap") which is located directly below, and serving the Premises; (b) the sewer-lift station and equipment which are located directly below and serving the Premises; and (c) the existing 4 inch ABS lines which extend from the Grease Trap to the sewer lift station, and extend from that station to the existing 15 inch VCP sewer line, and the clean outs incorporated in said line. To the extent that the existing ABS and/or VCP lines are hereafter replaced, Tenant's obligation established hereunder shall be deemed to extend to such replacement lines (regardless of size). Tenant shall be solely responsible for the expense and all costs associated with the performance of Tenant's obligations hereunder, and for the costs, damages, or expenses arising from any outages, interruptions or failures of the sewer or Grease Trap system serving the Premises arising from Tenant's failure to perform such obligations.

15. MAINTENANCE. Except as otherwise provided by this Agreement, Landlord shall maintain in good condition at its own expense (subject to reimbursement for specific items as set forth in Section 16 below), the structural portions of the Premises building and Portico Structure, which includes foundations, bearing and the exterior walls, (but excluding the roof, HVAC(s), venting and other roof mounted systems, glass and doors, and exterior wall surfaces, decking, stairs and stairways and further excluding routine maintenance thereof). Landlord shall be responsible for maintaining the Common Area Parking areas, the landscaping immediately adjacent to the Premises, and the drainage systems incorporated therein, subject to Tenant's obligation to reimburse Landlord under Section 16 as additional rent due hereunder. Tenant shall, at Tenant's sole cost, maintain all other portions of the Premises, in good and sanitary condition and repair, and all systems serving the same, including by way of example and not limitation, all interior portions, and exterior surfaces of the Premises, and the Portico improvements, the roofs, the HVAC systems, fans vents and air filter systems serving the Premises, the sewer and water lines serving the Premises, and the grease trap and sewer lift station serving, and located at the Premises, and all glass and doors, and shall repair all damages at the Premises whatsoever resulting from use by Tenant, the Tenant Parties or any person permitted to be on the Premises by Tenant.

16. OPERATING EXPENSES/ADDITIONAL RENT. Each month, Tenant shall pay, as additional rent due hereunder, equal monthly payments towards the following annual expenses as reasonably estimated by the Landlord (collectively, the "Operating Expenses"):

a) the annual premiums on casualty insurance carried by the Landlord for the building in which the Premises is located, and the adjacent Portico structure (or the reasonable pro-rata portion of such insurance in the event that Landlord includes other buildings in a blanket policy for the same);

b) twenty-one percent (21%) of the annual real property taxes for APN's 005-251-006 and 005-261-001;

c) twenty-one percent (21 %) for the estimated cost of repair and maintenance expenses

associated with the Common Area Parking area; and,
d) all of the estimated costs and expenses incurred by Landlord for watering and maintaining the landscaping adjacent to the Premises.

As an additional Operating Expense due hereunder, payable in monthly installments of additional rent, Tenant shall reimburse Landlord: (1) for the Tenant's share, to wit; twenty-one percent (21%), of any cost to resurface, seal and/or restripe the Common Area Parking area; and, (2) for the estimated cost of any re-landscaping the landscape area adjacent to the Premises. Payment for these costs shall be paid, in equal monthly installments, payable over the useful life of the described improvements, which shall be deemed to be five (5) years.

Notwithstanding the foregoing, Tenant shall not be liable hereunder for or required to pay any increase of, or reassessment in real property taxes resulting from a "change in ownership" (a "CIO") (as defined in California Revenue and Taxation Code section 60 et seq. and regulations adopted pursuant thereto) of the Premises. more than one (1) time during any consecutive seven (7) year period during either the Initial Term or any extension thereof Term. It is the parties intent that upon inclusion of any CIO within Real Estate Taxes, <u>or upon the expiration of any eighty four (84) consecutive month period which includes less than two (2) CIO's,</u> that all previously excluded CIO's also be included such there be a "catch-up" with respect to total Real Estate Taxes. Except as specifically herein provided, Tenant shall otherwise be required to pay all assessments, increases, and reassessments in real property taxes during the Initial Term or extensions of the term of this Lease.

On or before March 1 of each year of the Term, Landlord shall provide Tenant with a reconciliation of the actual Operating Expenses of the year and the estimated Operating Expenses paid by Tenant hereunder. Tenant shall pay any underpayment of Operating Expenses for the prior year within thirty (30) days or receipt of Landlord's reconciliation. If Landlord's reconciliation of Operating Expenses shows that Tenant overpaid during the prior calendar year, the overpayment shall be applied towards the next month or month's Operating Expenses.

17. <u>ENTRY BY LANDLORD AND LANDLORD'S RESERVATIONS FOR ACCESS</u>.

17.1. <u>Landlord's Entry and Access to Premises.</u> Landlord reserves and shall at any and all times have the right to enter the Premises, upon such notice as may be reasonable under the circumstances, to inspect the same or to perform any of the Landlord's obligations hereunder, to exhibit the Premises to prospective lenders, purchasers or tenants, to post notices of non-responsibility, and to alter, improve or repair the Premises, and may for such purpose erect scaffolding and other necessary structures where reasonably required by the character of the work to be performed. Provided Landlord provides Tenant with reasonable access to the Premises during such periods of alteration or repairs, then (a) there shall be no abatement of rent, and (b) Tenant hereby waives any claim for damages for any loss of, or interference with the occupancy or quiet enjoyment of the premises, and for other loss occasioned thereby. Landlord's right of entry shall include entry by Landlord's authorized representatives, upon reasonable notice, to inspect the condition and proper installation of Tenant's possessions.

17. 2 <u>Reservation of Access for Landlord and Public to Pedestrian Bridge, Spiral Stairwell to beach and Public Beach Area</u>. Landlord and Tenant acknowledge and agree that certain walkways around the restaurant building have previously been utilized by the public for access to a beach area lying below the Premises. In approximately 2005, a Pedestrian Bridge at the Premises which served a Spiral Stairwell to the beach area collapsed. Landlord intends on applying to the governmental authorities having jurisdiction over these improvements and areas, for permission to replace and or

repair (collectively the "Proposed Repair Work") the Pedestrian Bridge and Spiral Stairs as the same are generally depicted on Exhibit "D"). The Proposed Repair Work is not a condition, or an obligation of the Landlord under this lease. Landlord and Tenant agree that Landlord shall have access to the Premises under the provision of Section 17.1 for purposes of performing any and all actions necessary to complete the Proposed Repair Work during the term of this Lease. Landlord hereby further reserves, for the benefit of the Landlord, and the public, the right of access, ingress and egress, to the Pedestrian Bridge the Spiral Stairs and the beach area appurtenant to those improvements. Landlord and Tenant agree that neither the Pedestrian Bridge, or the Spiral Stairs are a part of the Premises leased hereunder, and that to the extent that Landlord performs the Proposed Repair Work, that the costs of all such work and installations, and the costs of maintaining the same thereafter, shall be the obligation of Landlord, and performed at Landlord's sole cost and expense, unless otherwise and hereafter agreed to by and between the parties by a separate written agreement.

18. SALE BY LANDLORD. In the event of a sale or conveyance by Landlord of the Premises, the same shall operate to release Landlord from any liability for any of the covenants or conditions, express or implied herein contained in favor of Tenant arising after such sale or conveyance, and in such event Tenant agrees to look solely to the successor in interest of Landlord, who shall be bound by the terms of this Agreement.

19. TAXES. Tenant shall pay, before delinquent, all taxes levied upon any of Tenant's personal property in and/or located at the Premises, or any fixture or other property made, installed or added to the Premises by Tenant.

20. SIGNS. All signs installed by Tenant shall require the prior approval of Landlord and shall be in compliance with all applicable governmental requirements. Tenant shall be solely responsible for the cost or installation, maintenance and repair of such signage.

21. FIXTURES. All improvements to, or fixtures on the Premises, made or added by either party, except trade fixtures added by Tenant that may be removed as hereinafter provided, shall be and become the property of Landlord upon their being affixed or added to the Premises. If, at the termination of the Term hereof, Tenant shall not be in default hereunder, Tenant may remove such trade fixtures as shall be affixed or added to the Premises, if such trade fixtures may be removed without damage to the Premises, or if Tenant fully repairs any damage caused by such removal. Any trade fixtures belonging to Landlord at the Premises as of the commencement of this Lease, being a portion of the Landlord's Personal Property, shall remain the property of Landlord and may not be removed by Tenant hereafter without Landlord's prior consent, notwithstanding the foregoing, Tenant shall be responsible for the maintenance and repair of the Landlord's Personal Property during the term of this lease..

22. SECURITY DEPOSIT. Tenant shall have deposited with Landlord prior to the execution of this Agreement, the amount of $10,500.00, as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay rent or any other charge due hereunder, or otherwise defaults with respect to any provision of this Agreement, Landlord may use, apply or retain all or any portion of said security deposit for payment of any rent or other charge in default, or for the payment of any other sum for which the Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said security deposit, Tenant shall within ten (10) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore said security deposit to the full amount hereinabove stated and Tenant's failure to do so shall be a material breach of this Agreement. Landlord shall not be required to keep the security deposit separate from its

general accounts. If Tenant performs all of Tenant's obligations hereunder, said security deposit or so much thereof as has not theretofore been applied by Landlord, shall be returned to Tenant without interest following the expiration of the Term hereof, as may be extended hereafter, within thirty (30) days after Tenant has vacated the Premises. No trust relationship is created between Landlord and Tenant with respect to said security deposit.

23. DEFAULT: REMEDIES. The occurrence of any of the following shall constitute a default by Tenant (each an "event of Default"): (a) the vacating and abandonment of the Premises for five (5) or more consecutive days; (b) the failure to pay any rent, additional rents or any other amount due under this lease, when due, where such failure continues for a period of five (5) days following delivery of written notice to Tenant; (c) the failure to observe or perform any of the other terms of this Agreement (including, without limitation, any of the terms of Exhibit "B" attached hereto), where such failure continues for a period of ten (10) days after written notice to Tenant; provided, however, that if the nature of Tenant's default is non-monetary and such that more than ten (10) days are reasonably required for its cure, then it shall not be deemed to be a default of this Agreement if Tenant commences such cure within said ten (10) day period and Tenant thereafter diligently prosecutes such cure to completion; and (d) if all or substantially all of Tenant's assets shall be placed in the hands of a receiver or trustee and if this receivership or trusteeship continues for a period of thirty (30) days, or should Tenant make an assignment for the benefit of creditors, or be adjudicated bankrupt, or should Tenant institute any proceedings under any state or federal bankruptcy act in which Tenant seeks to be adjudicated bankrupt, or seeks to be discharged of debts, or should any voluntary proceedings be filed against this Tenant under the bankruptcy laws and Tenant consents to it and acquiesces by pleading or default.

24. REMEDIES.

24.1. Generally. Upon the occurrence of an Event of Default, Landlord, in addition to any other rights or remedies available to Landlord at law or in equity, shall have the right to:

24.1.1. Right of Re-Entry. Upon the occurrence of an Event of Default, Landlord shall also have the right, with or without terminating this Agreement, to re-enter the Premises and remove all persons and property from the Premises. Landlord may store the property removed from the Premises in a public warehouse or elsewhere at the expense and for the account of Tenant.

24.1.2. Termination. None of the following remedial actions, alone or in combination, shall be construed as an election by Landlord to terminate this Agreement unless Landlord has in fact given Tenant written notice that this Agreement is terminated or unless a court of competent jurisdiction decrees termination of this Agreement: (a) any act by Landlord to maintain or preserve the Premises; (b) any efforts by Landlord to re-let the Premises; any re-entry, repossession, or re-letting of the Premises; or (c) any re-entry, repossession, or re-letting of the Premises by Landlord pursuant to this Section. If Landlord takes any of the previous remedial actions without terminating this Agreement, Landlord may nevertheless at any later time terminate this Agreement by written notice to Tenant.

24.1.3. Re-letting by Landlord. If Landlord re-lets the Premises, Landlord shall apply the revenue from the re-letting as follows: first, to the payment of any indebtedness other than rent due from Tenant to Landlord; second, to the payment of any cost of re-letting, including without limitation finder's fees and leasing commissions; third, to the payment of the cost of maintenance and repairs to the Premises; and fourth, to the payment of rent and other amounts due and unpaid under this Agreement. Landlord shall hold and apply the residual, if any, to payment of future amounts payable under this Agreement as the same may become due, and shall be entitled to retain the eventual balance with no liability to Tenant. If the revenue from re-letting during any

month, after application pursuant to the previous provisions, is less than the sum of (i) Landlord's expenditures for the Premises during that month and (ii) the amounts due from Tenant during that month, Tenant shall pay the deficiency to Landlord immediately upon demand.

24.1.4. Cure by Landlord. After the occurrence of an Event of Default, Landlord, in addition to or in lieu of exercising other remedies, may, but without any obligation to do so, cure the breach underlying the Event of Default for the account and at the expense of Tenant. However, Landlord must by prior notice first allow Tenant a reasonable opportunity to cure, except in cases of emergency, where Landlord may proceed without prior notice to Tenant. Tenant shall, upon demand, immediately reimburse Landlord for all costs, including costs of settlements, defense, court costs, and attorney fees that Landlord may incur in the course of any cure.

24.2. Security as No Bar or Defense. No security or guaranty for the performance of Tenant's obligations that Landlord may now or later hold shall in any way constitute a bar or defense to any action initiated by Landlord for unlawful detainer or for the recovery of the Premises, for enforcement of any obligation of Tenant, or for the recovery of damages caused by a breach of this Agreement by Tenant or by an Event of Default.

24.3. No Exclusive Remedy. Except where this is inconsistent with or contrary to any provisions of this Agreement, no right or remedy conferred upon or reserved to either party is intended to be exclusive of any other right or remedy, or any right or remedy given or now or later existing at law or in equity or by statute. Except to the extent that either party may have otherwise agreed in writing, no waiver by a party of any violation or nonperformance by the other party of any obligations, agreements, or covenants under this Agreement shall be deemed to be a waiver of any subsequent violation or nonperformance of the same or any other covenant, agreement, or obligation, nor shall any forbearance by either party to exercise a remedy for any violation or nonperformance by the other party be deemed a waiver by that party of the rights or remedies with respect to that violation or nonperformance.

24.4. Additional Statutory Remedies:

(1) Landlord may recover from Tenant all damages specified in California Civil Code Section 1951.2 including the net worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of the award exceeds the amount of such rental loss for the same period that the Tenant proved could be reasonably avoided; and,

(2) Landlord has the remedy described in California Civil Code Section 1951.4 (Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations.

25. SUBORDINATION/ATTORNMENT/ESTOPPEL CERTIFICATES. This Agreement, at Landlord's option, shall be subordinate to the lien of any first deed of trust or first mortgage subsequently placed upon the Real Property of which the Premises are a part, and to any advances made on the security of it, and to all renewals, modifications, consolidations, replacements, and extensions; provided, however, that as to the lien of any deed of trust or mortgage, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant shall pay the rents and observe and perform all of this Agreement's provisions, unless this Agreement is otherwise terminated pursuant to its terms. If any foreclosure proceedings are brought, or if a power of sale under any mortgage or deed of trust made by Landlord covering Premises is exercised, Tenant shall attorn to the purchaser upon any foreclosure or sale and recognize that purchaser as landlord under this Agreement, provided that the purchaser shall agree that so long as no

Event of Default exists under this Agreement, Tenant's right to quiet possession shall not be disturbed. If upon any sale, assignment, or hypothecation of the Premises by Landlord, or at any other time, an estoppel certificate or financial statement shall be requested of Tenant, Tenant agrees, within ten (10) days afterwards, to deliver the financial statement or the estoppel certificate addressed to any proposed mortgagee, lender or purchaser, and to Landlord, certifying the requested information, including the dates of commencement and termination of this Agreement, the amounts of security deposits, if any, that the Agreement is in full force, and that there are no modifications, differences, offsets, defaults of Landlord, or expressly noting any such modifications, differences, offsets or defaults that actually then exist. Tenant acknowledges that the mortgagee, lender or purchaser shall have the right to rely on the estoppel certificate or financial statement required hereunder, and that the failure of the Tenant to timely provide a financial statement or estoppel certificate hereunder shall be a material default under this agreement. Tenant shall in the same manner acknowledge and execute any assignment of rights to receive rents as required by any mortgagee or lender of Landlord.

26. DESTRUCTION OF PREMISES. If, during the Term hereof, the Premises or the building in which the Premises are located are totally or partially destroyed by any cause rendering the Premises totally or partially inaccessible or unusable, Landlord shall restore the Premises or the building in which the Premises are located to substantially the same condition as immediately before destruction, if the restoration can be made under the existing laws and completed within six (6) months after the date of destruction. Such destruction shall not terminate this Agreement. If the restoration cannot be made within six (6) months, then within fifteen (15) days after the parties determine that the restoration cannot be made within six (6) months, either party may terminate this agreement immediately by giving notice to the other as provided in Paragraph 31 herein. If Tenant fails to so terminate this Agreement and if restoration is permitted under the existing laws, Landlord, at its election may restore the Premises or the building in which the Premises are located within a reasonable time, and this Agreement shall continue in full force and effect. If the existing laws do not then permit the restoration, either party can terminate this Agreement immediately by giving written notice to the other party. If Landlord is required or elects to restore the Premises, Landlord and Tenant shall equally share in the costs required to restore the building above and beyond available insurance proceeds for the same, except as otherwise expressly herein provided. As to any alterations made by Tenant or Tenant's improvements, trade fixtures, or personal property of Tenant, Landlord shall have no responsibility for the costs of restoration or replacement, which costs shall be the sole responsibility and cost of Tenant. If this lease is not otherwise terminated pursuant to the foregoing provisions, Rent shall abate for the period beginning on the date of the destruction until restoration allows for Tenant's legal occupancy of the Premises for purposes of Tenant's allowed use hereunder. Notwithstanding any provision herein to the contrary, the parties agree and acknowledge that any significant reconstruction or restoration of the Premises ("reconstruction") may require the permission and consent of the California Coastal Commission (or it's successor entity, hereinafter collectively the "Coast Commission"). To the extent that any reconstruction otherwise required to be performed by Landlord requires the permission and consent of the Coastal Commission, and Tenant is unable to legally occupy and use the Premises for the purposes herein contemplated until such consent, permission or consent of the Coastal Commission is obtained by Landlord, then either party shall have the right to terminate this agreement at any time during the period that Tenant is unable to so legally occupy and use the Premises without said Coastal Commission's Consent upon fifteen (15) days written notice to the other.

27. CONDEMNATION. In the event that all of the Premises, or any part hereof which makes the remaining portion of the Premises unsuitable or inadequate for the purposes set forth herein, shall be taken under the power of eminent domain, this Agreement shall thereupon terminate

as of the date of possession by the condemning party or the date title vests in the condemning party whichever occurs first, and Tenant shall be released and discharge of any and all further liability to Landlord hereunder. A voluntary sale by Landlord to a party having the power of eminent domain, so long as condemnation proceedings are pending or can be reasonably be determined to be imminent, shall be deemed to be a taking by eminent domain for the purposes of this paragraph. All damages awarded for any taking under the power of eminent domain, whether for full or part of the building or Premises, shall belong to and be the property of Landlord, whether such damages shall be awarded as compensation for the diminution in the value of the leasehold or for the Premises. Notwithstanding the foregoing, if only a part of the Premises shall be so taken or condemned, and as a result thereof of Tenant's use is not materially adversely affected, this Agreement shall not terminate and the rent shall be reduced in proportion to the value of the portion taken compared to the value of the entire Premises, effective with the taking.

28. SUCCESSORS AND ASSIGNS. The covenants and conditions herein contained shall apply to and bind the heirs, successors, executors, administrators and assigns of all the parties hereto.

29. ATTORNEY'S FEES. The prevailing party in any action arising out of this Agreement shall be entitled, in addition to any other relief awarded, to recover reasonable attorneys' fees and costs. The prevailing party shall also be entitled to recover reasonable attorneys' fees and costs incurred in the enforcement of any judgment entered in favor of the prevailing party, including, without limitation, attorneys' fees and costs incurred in obtaining and enforçing a writ of possession or in the collection or attempted collection of any monetary amounts due under the judgment. Such post-judgment attorneys' fees and costs may be claimed from time to time in supplemental memoranda of costs file with the court and thereafter shall be added to and become a part of the judgment.

30. WAIVER. The waiver by Landlord or Tenant of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained.

31. NOTICES. Any and all notices, demands, requests, or other communications which either party may be required or desire to give to or serve upon the other party shall be in writing and shall be personally delivered or sent by first class mail, postage prepaid, to the following address:

TO THE LANDLORD:

Martin Hotel Management, LLC
Noreen Martin
PO Box 12060
San Luis Obispo, CA 93406

TO THE TENANT:

The Old Custom House, Inc.
Tim Hodge, Corporate Counsel
200 So. 13th St., Suite 208
Grover Beach, CA 93433

Either party may change its address by giving the other party written notice of its new address as provided herein.

32. MISCELLANEOUS. This Agreement is governed by the laws of the State of California, and any questions arising hereunder shall be construed or determined according to such laws. Headings at the beginning of each numbered paragraph of this Agreement are solely for the

convenience of the parties and are not a part of this Agreement. Time is of the essence in this Agreement. The invalidity of any provision hereof shall not affect the validity of any other provision. All amendments to this Agreement must be in writing and signed by the party to be charged. This Agreement constitutes the sole and only agreement relating to the matters covered hereunder. Any prior leases, agreement, promises, negotiations or representations concerning the subject matter hereof not expressly set forth in this Agreement shall be of no force or effect.

33. APPROVAL OF LANDLORD'S LENDER. Landlord and Tenant acknowledge that the Lease must be approved by Landlord's lender ("Lender") and that Lender may condition such approval on modifications of the Lease. Landlord and Tenant agree to take reasonable steps to incorporate Lenders' changes, if any, into the Lease through an amendment to the Lease. However, if Tenant, it its reasonable discretion, feels that any modifications to the Lease required by Lender change a material term of the Lease, Tenant may refuse to agree to such modifications. If Tenant refuses to agree to such modifications, Landlord may terminate the Lease.

A change to a material term of the Lease is one that affects either the term of the Lease or increases the rent or other economic burden placed upon the Tenant.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth opposite their respective signature below.

LANDLORD:

MARTIN HOTEL MANAGEMENT, LLC
A California limited liability company

By: Noreen Martin
Martin Resorts, Inc., Member
Noreen Martin, CEO

Dated: 7-12-2012

TENANT:

OLD CUSTOM HOUSE, INC.,
a California corporation

By: [signature]
Darren P. Smith, CEO, President

Dated: 7/12/12

By: [signature]
Timothy Hodge, Secretary

Dated: 7/12/12

EXHIBIT A
Page 1
DESCRIPTION OF PREMISES

See attached Diagram of Premises

The Premises include the entire restaurant building which contains:

*Restaurant areas

*Bar/lounge areas

*Banquet/meeting areas

*Kitchen areas

*Kitchen storage areas

*Additional storage areas

*Restrooms and Offices

EXHIBIT A page 2



EXHIBIT B

OPERATION OF THE BUSINESS

1. Transition Matters.

a. Public Relations/Announcements. Neither party shall make any public statements concerning the execution of this Agreement and the matters described herein except as mutually agreed to by both parties hereto, which shall not be unreasonably withheld.

2. Operation of the Restaurant

a. Standard of Operation. The Restaurant shall be operated as a first class restaurant substantially similar to Tenant's "Custom House" restaurant, as to décor, service, food quality, and quality of the menu and wine list. Tenant shall have the exclusive and final authority to operate all "day to day" operations of the Restaurant. The Restaurant shall institute and maintain a first class wine list. The theme and menu of the Restaurant shall be predetermined and agreed upon by Landlord and Tenant, while emphasizing quality wine and the San Luis Obispo County wine country experience; the determination as to "theme and menu" shall involve input from Landlord and Tenant, but shall be within the final and reasonable discretion of Tenant. The décor shall not disturb the integrity of the building and shall be consistent with the décor of the restaurant, with a more "contemporary" feel; the determination as to "décor" shall involve input from Landlord and Tenant, but shall be within the final and reasonable discretion of Landlord.

b. Hours of Operation. The Restaurant shall otherwise be initially open for lunch on Fridays through Sunday only and for dinner every day of the week. The bar shall be open until at least 12:00 am (midnight) every Friday and Saturday night, as well as the night before any national holiday. Tenant shall have the right to modify hours of operation to include additional hours, with prior notice to Landlord, however, Tenant shall not reduce its hours below that provided above without Landlord's prior written consent which may be given or withheld in Landlord's sole discretion. Tenant may open the Restaurant to the public for breakfast at all reasonable times determined by Tenant.

c. Parking. Tenant shall cooperate with Landlord in creating policies regarding employee parking. In no event shall Tenant's customers and employees park in any area of the Real Property other than the parking areas included within the Common Area Parking area as delineated on Exhibit "A."

d. Continuous Operation. Tenant shall continuously during the entire Term conduct Tenant's business at the Premises and shall keep the Premises open for business as herein provided and cause Tenant's business to be conducted during at least the minimum times set forth in Paragraph "b" above.

3. Operation of Catering Business. Tenant shall operate the catering business at and from the Restaurant substantially in accordance with the present operation as conducted by Tenant, unless otherwise agreed to in writing by Landlord. Tenant shall coordinate catering for events

organized by or for Landlord guests with the Restaurant and the parties shall mutually and reasonably cooperate in the scheduling and pricing for such events. Tenant shall also offer catering for events scheduled by or for Pismo Lighthouse Suites and Avila Lighthouse Suites if requested by Landlord, and the parties shall mutually and reasonably cooperate in the scheduling and pricing for such events. Tenant has the right to refuse any catering order at Tenant's reasonable discretion, if Tenant determines that an order is not beneficial to the parties hereto; Tenant agrees to fully cooperate with Landlord to find a third party to handle any catering order reasonably refused by Tenant. While Tenant is obligated to offer its catering services as described above, nothing herein shall be deemed to grant Tenant the exclusive right to cater at the Shore Cliff Lodge, Shelter Cove Lodge, Pismo Lighthouse Suites and/or Avila Lighthouse Suites.

4. Operation of Meeting and Banquet Facilities. Tenant's use of the meeting and banquet facilities shall be in compliance with their lease.

5. Compliance with Applicable Laws. At all times in the operation of the Restaurant and generally in connection with the use and occupancy of the Premises, Tenant shall comply with all laws, regulations, orders, ordinances and rules of any governmental jurisdiction having authority over the Premises and/or the Restaurant. Tenant shall operate under any liquor license strictly in accordance with all applicable laws, rules and regulations pertaining thereto.

Tenant shall, at Tenant's sole cost, comply with all of the requirements of all municipal, state, and federal authorities now in force or that may later be in force pertaining to the use of the Premises, including but not limited to the Americans With Disabilities Act, as the same now exists or may hereafter be modified, and shall faithfully observe in this use all municipal ordinances and state and federal statutes now in force or that shall later be in force. The judgment of any court of competent jurisdiction, or the admission of Tenant in any action or proceeding against Tenant, whether Landlord be a party or not, that Tenant has violated in order or statue in this use, shall be conclusive of that fact as between Landlord and Tenant. Tenant shall not commit, or suffer to be committed, any waste upon the Premises, or any nuisance or other act or thing that may disturb the hotel guests in the adjacent property which is operated by the Landlord.

6. Relationship with Shore Cliff Hotel.

a. Room Service. Tenant may provide room service delivery to the hotel guests during hours of restaurant operation. Tenant will charge guests directly for the cost of room service; there will be no room charges to the hotel. If Tenant wishes to provide this service, the menu, menu pricing and delivery time standards shall be agreed upon between Tenant and Shore Cliff management from time to time.

b. Packages. It is anticipated that Landlord will promote packages for guests of the hotel from time to time during the Term that will feature guest room nights together with dining privileges in the Restaurant. The parties will, from time to time, establish a protocol for approving packages in advance, and for recordkeeping and payment for such dining privileges. Tenant shall not unreasonably delay or withhold its participating or consent to such packages.

c. Employee Behavior. Generally, Tenant shall have all authority and responsibility for the direction, hiring and firing of its employees. Tenant shall cause all of its

employees to conform strictly to Landlord's rules and regulations for the behavior of hotel employees with regard to parking, personal grooming and conduct and the presence of guests of the hotel. In the event a Tenant employee fails to conform to these rules, Landlord may request that Tenant remove and/or replace the employee, and the Tenant shall make every best effort to reasonably comply with such demand, at the mutual discretion of Landlord and Tenant.

d. No Interference with Hotel. In the operation of the Restaurant, Tenant shall not, and shall not permit its employees or guests to, create any unreasonably objectionable noise, vibration or odor inconsistent with the operation of the hotel and the quiet enjoyment by the hotel's guests of their room nights.

e. No Interference by Hotel. In the operation of the Hotel, Landlord shall not, and shall not permit its employees or guest to interfere with Tenant's "day to day" operations of the Restaurant subject to the terms and provisions herein. Nothing in this paragraph shall in any way limit or override the obligations of Tenant, or the rights of Landlord, stated elsewhere in this Agreement, including any exhibit.

f. Joint Event Business. Landlord and Tenant shall reasonably cooperate on booking and fulfillment of event business that utilizes the resources of both the Hotel and Restaurant, such as weddings. Tenant shall pay an agreed upon site fee to Landlord when such events utilize the Gazebo space at the hotel. This cooperation will extend to the hotel's government contract business which has regulations and restrictions as to room and food charges.

g. Chairs/Amplification System Storage: Landlord agrees to provide Tenant a non-exclusive enclosed storage area reasonably accessible to Tenant, for the Tenant's off-Premises storage of up to 175 folding chairs, an arch and a sound system, as the same may be owned, and used by Tenant at the Gazebo Site. Landlord reserves the right to re-designate and relocate such storage area upon reasonable notice to Tenant, so long as such storage area is located on the first floor of building in which the storage is located, and reasonably accessible by Tenant for utilization of the Gazebo Site. To the extent that the use of the Gazebo Site is no longer feasible, or legally possible as a result of damage or destruction of the Gazebo structure, or the rules, regulations or enactments of any governmental authority having jurisdiction over the same, Landlord shall have no further obligation to Tenant under this paragraph.

7. Cross-Promotion: Benefits

a. Signage. Tenant may install and maintain during the lease Term up to two (2) exterior signs, the location, size, appearance and contents of which shall be subject to the parties' mutual approval and shall conform to applicable law in all respects.

b. Promotion of Restaurant by Landlord. Landlord may promote the Tenant's Restaurant (as conducted at and from the Hotel only), as reasonably determined by Landlord, from time to time in its own promotions, and Tenant authorizes Landlord to use and include its names and logos in such promotions; provided, however, that the use of such names and logos shall be strictly limited to promoting Tenant's business, will in no case be derogatory, defamatory or negative, and will be subject to Tenant's reasonable written rules or procedures as delivered to Tenant Landlord from time to time.

EXHIBIT C

SHORE CLIFF LODGE
GAZEBO SITE INITIAL RENT PRICING

| Event: | RENT: |
|---|---|
| Under 50 people | $400 per event/use |
| 50-99 people | $600 per event/use |
| 100-220 people | $800 per event/use |

1. Ventana Grill staff will be responsible for removing from, and returning all necessary chairs, the arch and sound system (collectively the "Equipment") to, storage, all associated transportation of such items, and thel set up and take down of said Equipment at the Gazebo Site
2. Ventana Grill staff will clear all Equipment from the Gazebo Site immediately after each event/use, (and on the same day as such event/use) and shall similarly remove any debris at the Gazebo Site and immediately adjoining areas, which was generated by the event/use.
3. Gazebo Site Rent, as above setforth, is subject to future annual adjustments based upon the formula and adjustment dates as provided under Section 3.3 and 3.10 of the Lease (i.e as provided for future adjustment of Base Rent).

EXHIBIT D


(E) Pedestrian Bridge
(N) Approximate location of New Wall
(E) Spiral Stairs

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# COUNTY OF SAN LUIS OBISPO

**Department 2**
**(Effective September 24, 2021)**

STANDING CASE MANAGEMENT ORDER

**INSTRUCTIONS TO PLAINTIFF(S)/CROSS-COMPLAINANT(S):**

**YOU shall serve a copy of this Standing Case Management Order on all Defendants/Cross-Defendants at the same time the complaint/cross-complaint is served.**

## I. GENERAL MATTERS

A. It is the Court's policy to provide a dignified forum in which to resolve disputes in a peaceful, professional, legally correct, and expeditious manner. The following rules are designed to achieve these goals. It is not the Court's intention to prohibit a party from raising any issue by any means allowed by the Rules of Court or the applicable law. If the rules or procedures discussed in this order raise a concern, counsel should raise the matter with the Court at the earliest opportunity.

B. Electronic communication with the Courtroom Clerk is permissible for routine communications having to do with scheduling, stipulated continuances, and/or joint requests. Substantive arguments are not permitted. In any correspondence with the Clerk, all parties shall be copied in order to avoid ex-parte communications. The Clerk's email address is D2clerk@slo.courts.ca.gov.

## II. CASE MANAGEMENT CONFERENCES ("CMCs")

A. Detailed CMC Statements are strongly encouraged. The Court expects the parties will be prepared to discuss the current status of the case, discovery, amenability to mediation, and any unusual factual, legal, or evidentiary issues that may need resolution. In the event the parties fail to appear, the matter will typically be set for an OSC hearing to consider why sanctions should not be issued.

B. It is the Court's policy to resolve discovery disputes informally when possible. Accordingly, the Court has instituted special procedures for the resolution of discovery disputes through the Pretrial Discovery Conference Procedure (see Section IV.C below).

## III. MEDIATION

A. The parties are strongly encouraged to engage in early, meaningful mediation. Mediation should ordinarily take place within 90-120 days of all parties' first appearances.

B. Parties who agree to private mediation should comply with the mediator's instructions regarding briefing and payment of fees.

C. A worthwhile mediation process means that the parties, attorneys, and any other person whose consent or authority is required to achieve a final disposition of the dispute shall be present, as well as a representative of any insurer who has authority to settle the case for any amount up to the policy limits.

## IV. LAW AND MOTION MATTERS

A. To the extent practicable, the Court will post tentative rulings on law and motion matters on the Court's website no later than the evening before the hearing. The Court's website is located at www.slo.courts.ca.gov.

B. When the parties agree to have a matter taken off calendar, they shall promptly notify both the Clerk and the Research Attorneys via e-mail. This is important in order to avoid unnecessary commitment of judicial resources to moot matters. The contact information for the Research Attorneys is SloCourtAttorneys@slo.co.ca.gov. The parties also shall file a written stipulation and proposed order requesting to take the matter off calendar, or appear at the hearing to make the request.

C. Resolution of Discovery Disputes

1. The parties may stipulate to proceeding with an informal Pretrial Discovery Conference, in lieu of filing and serving discovery motions, under Code of Civil Procedure sections 2016.010 through 2036.050. In that event, the parties shall proceed as follows:

   a. All parties to the discovery dispute shall sign a written stipulation electing to resolve the specified discovery dispute(s) between them according to the procedure outlined in this section IV.C. The parties shall stipulate to waive their right to proceed with a regularly noticed motion, and shall stipulate that the Court can issue binding discovery orders as a full and final resolution of the dispute(s).

   b. A Request for Discovery Conference must be filed with the Clerk's Office on the approved form, along with the stipulation described in the preceding paragraph. The request must include a brief summary of the dispute. An Answer to Request for Discovery Conference also must be filed on the approved form, setting forth a brief summary describing why the requested discovery should be denied. The form Request and Answer are available on the Court's website as a local court form or on request from the Clerk's Office. Each document shall be no more than five (5) pages in length. The Answer shall be filed within five (5) business days of receipt of the request.

   c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. The parties will be notified by minute order whether the request has been granted or denied and, if granted, the date and time of the Pretrial Discovery Conference. Counsel are to appear at the conference in person or by videoconference.

e. The Court will issue a binding order at the conclusion of the Pretrial Discovery Conference.

D. Default Prove-ups

1. The parties shall submit evidence of damages in support of a judgment after default in the form of written declarations. Hearings to receive live testimony and other evidence reflecting damage claims will not be scheduled until after the party seeking a default judgment has first attempted to prove the nature and extent of monetary damages by written declarations. If live testimony is required after review of written declarations, the Court will set a hearing date.

## V. MANDATORY SETTLEMENT CONFERENCES

The Court typically will set a mandatory settlement conference at a status conference prior to the trial readiness conference. The Court generally will refer the case to a volunteer settlement officer to conduct the settlement conference.

## VI. PRETRIAL PROCEDURES AND TRIAL READINESS CONFERENCES

A. Jury Instructions, Verdict Forms, and Witness Lists

At least two weeks prior to the readiness conference, the parties shall meet and confer with respect to jury instructions, proposed verdict forms, and time estimates for each witness.

1. Following the meet and confer process, the following documents should be emailed to the Clerk no less than one week prior to the readiness conference:

a. One joint set of proposed jury instructions in Word format. Proposed instructions shall be complete in all respects without unfilled "blanks" or "bracketed" portions. Disagreement as to particular instructions may be highlighted by color coding or other method.

b. One set of proposed verdict forms in Word format. Disagreement as to wording or other matters may be highlighted by color coding or other method.

c. A joint witness list reflecting the expected time for examination or cross-examination of each witness by each party (a sample template is attached to this order).

B. Trial Briefs

Trial briefs shall be filed no less than one week prior to the readiness conference.

C. Motions in Limine

Motions in limine shall be filed no less than one week prior to the readiness conference. Opposition to motions in limine shall be filed no less than one court day prior to the readiness conference. Before filing

motions in limine, counsel shall confer with the objective of reaching an agreement on as many issues as possible. (See *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669-677.) Counsel shall advise their clients and witnesses about rulings on motions in limine that pertain to evidentiary issues. Counsel will be held responsible for any violations of rulings on motions in limine. Motions in limine typically will be heard on the first day of trial, unless specially set by the Court.

D. Trial Readiness Conference

A trial readiness conference typically is scheduled two weeks before trial. At the readiness conference, trial counsel shall be present either in person or by videoconference, and shall be prepared to discuss the following topics.

1. Estimated length of trial. The time estimate shall account for jury selection, in limine motions, the examination of each witness, instruction of the jury, opening statements, and closing argument. Counsel are expected to provide accurate time estimates for the direct examination of each witness, as well as the cross-examination of each opposing witness. Time limits for all phases of the case will be established and enforced. A jury trial ordinarily will be in session from Monday through Thursday, from 10:30 a.m. to noon and 1:30 p.m. to 4:30 p.m.

2. Number, timing, and availability of witnesses. Any special witness needs, or the need to call witnesses out of order, will be addressed at the conference.

   a. Counsel have the responsibility to arrange the appearance of all witnesses during their presentation of the case so as to eliminate delays. Counsel should confer among themselves as to when witnesses will be needed at least 24-48 hours in advance of the witness's testimony.

   b. Counsel are to inquire of their clients and witnesses to determine whether they are in need of any type of accommodation, such as an interpreter, assistance under the Americans with Disabilities Act, or any other type of assistance.

3. Numbering and exchange of exhibits. The parties are encouraged to agree upon a reasonable exhibit numbering system. The exhibits used in the case-in-chief shall be pre-marked with exhibit labels and exchanged *no later than the morning of trial and earlier, if feasible.* The use of exhibit books or binders is strongly encouraged.

4. Voir dire procedures, mini-opening statements, and juror questionnaires. Counsel shall prepare a joint, neutral statement of the case to be read to the prospective jury panel. In the event juror questionnaires will be used, the questionnaires shall include a joint witness list.

5. Stipulations to reduce the length of trial. Counsel shall consult with each other regarding all possible stipulations and reduce them to writing. In particular, counsel should consider waiving the necessity for authentication/foundational evidence for all trial exhibits, unless authentication or foundation is an important issue. Agreements in this regard do not operate as a waiver of other proper trial objections.

6. Equipment needs. Counsel shall advise the Court if they need to arrange for the installation of equipment, such as video monitors or overhead projectors.

7. Court reporting services. Counsel shall advise the Court if a private court reporting service will be engaged to report the trial proceedings. The Court is unable to provide an official court reporter at this time.

8. Health and safety measures. The Court will discuss the existing measures that will govern the trial proceedings to ensure the health and safety of the participants, such as any procedures to address the Covid-19 pandemic.

## VII. TRIAL PROCEDURES

A. The Court will address organizational and scheduling matters, procedural issues, and in limine motions at the beginning of trial, including any matters continued from the readiness conference.

1. In the event the paiiies reach a settlement following the readiness conference, it shall be reported immediately to the Clerk so the necessary arrangements can be made to notify the members of the public, who would otherwise be reporting for jury duty, that their services are not needed.

2. The following items should be submitted to the Clerk on the first day of trial:

   a. Three copies of each party's exhibit list, with a brief description of each exhibit.

   b. The original exhibits with the exhibit labels attached to the front of the exhibit, with the case name, case number, and exhibit number.

   c. One bench copy of each exhibit that can be reproduced, for use by the Court, marked with exhibit numbers (labels are not required).

3. Originals of all depositions to be used at trial shall be lodged with the Clerk at the beginning of trial. At the end of the trial, these depositions can be picked up from the Court, or they can be returned by mail at the paiiy's expense.

4. Parties shall contact the Jury Commissioner on the first day of trial to arrange for payment of jury fees.

B. Jury Selection Procedures

1. Jury selection ordinarily begins at 1:30 p.m. on the first day of trial. If a questionnaire is used, the Court will consider hardships on the first day of trial, jurors will adjourn to complete the questionnaires, and the attorneys will receive the random list of prospective jurors. Voir dire will begin on day two of trial.

2. Mini opening statements of no more than three (3) minutes per side are encouraged, to be delivered prior to jury selection.

3. After the entire panel is screened for hardship, 18 names will be drawn at random, and voir dire shall proceed.

4. Challenges for cause shall be exercised and ruled upon out of the presence of the prospective jurors.

5. Typically, at least two (2) alternate jurors are selected. If it becomes necessary to substitute an alternate juror, the first alternate chosen will be the first substitute.

C. Trial Procedures

1. No charts, diagrams, or other exhibits should be shown or read aloud to the jury, unless by stipulation or after admission of the item into evidence.

2. Counsel shall provide hard copies of any power point presentations, audio or video recordings, and the like, to opposing counsel before showing them to the jury.

3. If counsel seek to introduce an audio recording (or audio portion of a video recording), they shall comply with Rule 2.1040 of the California Rules of Court.

4. Any object that cannot be folded into an 8½" x 11" size, such as models, blowups, etc., should be accompanied by either a photograph or a photocopy to be retained by the Court in lieu of the oversized exhibit.

5. When objections are made, counsel should state only the legal basis, without speaking objections.

6. Sidebar conferences are normally held off the record. Counsel may make a record of any unreported sidebar conference at an appropriate opportunity in the proceedings.

D. Post-Trial Procedures

1. After the verdict is rendered by the jury, the prevailing party shall prepare the proposed judgment, which should be submitted on the next court day following the return of the verdict, unless otherwise ordered.

2. Counsel should make arrangements with the Clerk for the return of the exhibits in cases that will not be appealed. The Clerk will hold the exhibits for 60 days after the filing of the notice of entry of judgment. Any exhibits remaining after that time will be destroyed, unless a notice of appeal is filed.

DATED: September 24, 2021

**TIME ESTIMATES**

| Witness | Role | Direct | Cross | Total |
|---|---|---|---|---|
| John Doe | Plfs Expert | 2.0 | 1.5 | 3.5 |
| Jane Doe | Plfs Exp Econ | 1.0 | 1.0 | 5.5 |
| Ann Miller | Plaintiff | 3.0 | 3.0 | 11.5 |
| Bob Miller | Plf s Husband | 2.0 | 1.0 | 14.5 |
| Joe Andrews | Defendant | 1.5 | 0.5 | 16.5 |
| Carol Rich | Defs Expert | 2.0 | 1.5 | 20.0 |
| Lisa Sexton | Def s Employee | 0.5 | 0.5 | 21.0 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# ALTERNATIVE DISPUTE RESOLUTION POLICY STATEMENT

**WAYS TO RESOLVE YOUR DISPUTE WITHOUT A TRIAL**
Presented by the San Luis Obispo County Superior Court

The mission of your Superior Court is to resolve civil disputes fairly and efficiently. It is the court's policy to encourage persons involved in a lawsuit to consider methods other than a trial to resolve their disputes.

Did you know that 95% of all cases filed in court do not go to trial? Most cases are settled or decided in some other way. In fact, methods of settling disputes that do not require a trial have become the first choice of most businesses, government agencies and unions. Agreements to mediate or arbitrate disputes are now commonly found in contracts covering employment, medical care, banking and insurance.

Alternative Dispute Resolution is a catch-all term that refers to the ways other than a trial that can be used to resolve the dispute you brought to the courthouse. These options are typically less formal than trial and many provide opportunities to reach an agreement through a problem-solving approach rather than the adversarial approach of a trial. ADR can save time, reduce costs and increase your overall satisfaction with the outcome.

## THE ADVANTAGES OF ADR

**Reduce Legal Costs**: Nearly all cases are resolved without a trial. If a settlement is likely anyway, wouldn't it be better to save attorneys fees, court costs and experts fees by settling early? In a recent survey, two thirds said they saved money by using ADR.

**Reduce The Time Spent on the Dispute**: A dispute can usually be decided or settled much sooner by using ADR. It is almost always less expensive.

**Increase Control Over the Result**: Some methods of ADR allow the parties to fashion creative resolutions that are not available in a trial. Other ADR methods permit the parties to entrust a decision about the dispute to an expert in a particular field instead of to a judge or a jury without the same experience or knowledge. And in ADR, both the dispute and its resolution can remain confidential.

**Preserve Relationships**: ADR is generally a less adversarial and hostile forum for dispute resolution than a trial. An experienced mediator or arbitrator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction**: In ADR, the parties usually have a better chance to tell their side of the story than they do in trial. This increases the likelihood the case will settle as well as the parties= overall satisfaction with the outcome.

**Improve Attorney-Client Relationships**: Attorneys may benefit from ADR by being seen as problem-solvers instead of as aggressive advocates. Quick, cost-effective results are likely to produce repeat and new business from clients and their friends and associates.

## WHAT ARE THE ADR OPTIONS?

### MEDIATION

In mediation, an independent, neutral person called a mediator helps the parties reach a mutually acceptable resolution of their dispute. The mediator does not decide the dispute but is trained to help the parties communicate so they can settle the dispute on terms they design themselves.

If mediation does not result in a settlement, the case is returned to court. And if the case goes to trial, there are laws that protect the confidentiality of the things discussed during mediation.

**Advantages**: Mediation leaves control of the outcome with the parties. It may be a particularly effective tool when the

parties have a continuing relationship to consider such as persons who work together, are neighbors or are members of the same family. Mediation is also effective where emotions are blocking a resolution. An effective neutral mediator can hear the parties out and help them communicate with each other in an effective and non-destructive manner.

**Disadvantages**: Mediation may be ineffective if one of the parties will not cooperate or is unwilling to compromise. And it may not be a good choice if the history of the parties includes abuse or victimization. Mediation may not produce a satisfactory resolution of the dispute if one of the parties has a significant advantage in power or rank than cannot be neutralized by the mediator.

**ARBITRATION**

In arbitration, an independent, neutral person called an arbitrator decides what the outcome of the dispute will be. Each side presents evidence supporting its case in a setting that is more informal than a trial. Rules of evidence are relaxed.

Arbitration may be either binding or non-binding. Binding arbitration means that the parties waive their right to a trial and agree to accept the arbitrator's award as final. Generally, there is no right to appeal an arbitrator's final decision. Non-binding arbitration means that the parties are free to request a trial by a judge or a jury if they are unwilling to accept the arbitrator's findings and award.

**Advantages**: Arbitration is informal and usually less expensive than a trial. If the dispute involves a particularly complex matter, the parties can select an arbitrator who has training or experience in the subject matter of the dispute. If the dispute is not complex, the parties may simply wish to avoid the expense of a trial

**Disadvantages**: Generally, there is no appeal from a arbitrator's finding or award even if it is not supported by the evidence or the law. If a party to a non-binding arbitration requests a trial, there may be penalties for failing to achieve a better result.

**NEUTRAL EVALUATION**

In early neutral evaluation, the parties employ an expert in the subject matter of the dispute and ask him or her to give them an opinion about how the dispute ought to be resolved. The expert's opinion is not binding and the parties use it to negotiate a resolution of the dispute.

**Advantages**: Neutral evaluation can produce early, creative settlements. If the parties are willing to listen and to compromise, the opinion of an expert they mutually select can provide a solid foundation for a long-lasting agreement.

**Disadvantages**: An expert can be expensive. The parties usually agree that neither the expert nor his or her opinion can be used in a trial if they cannot agree.

**COURT-SUPERVISED SETTLEMENT CONFERENCE**

Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a court-supervised settlement conference officer. The settlement conference judge or officer does not make a decision that is binding upon the parties. The judge or settlement officer helps the parties evaluate the case and to make decisions about settlement.

**Advantages**: A mandatory settlement conference gives the parties an opportunity before trial to negotiate a settlement in light of what they learned investigating the case and through discovery. The opinion of a settlement judge about the most likely outcome may inspire the parties to reevaluate their positions.

**Disadvantages**: A mandatory settlement conference is usually late in the life of a litigated dispute. It comes only after time and money has been spent preparing for trial. The parties' positions may have been hardened by what they have been through and they may be less willing to compromise.

**SUPERIOR COURT OF SAN LUIS OBISPO COUNTY**

☐ **San Luis Obispo Branch,** 1035 Palm Street, Rm 385, San Luis Obispo, CA 93408
☐ **Grover Beach Branch,** 214 South 16th Street, Grover Beach, CA 93433
☐ **Paso Robles Branch,** 901 Park Street, Paso Robles, CA 93446

*FOR COURT USE ONLY*

Plaintiff:

Defendant:

**STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 201.9)**

CASE NUMBER:

Judge

The parties and their attorneys hereby stipulate that all claims in this action shall be submitted to (select one):

☐ Mediation

☐ Neutral Case Evaluation

☐ Binding Judicial Arbitration

☐ Binding Private Arbitration

☐ Nonbinding judicial arbitration under CCP 1141.2 (discovery to close 15 days before arbitration under CRC, rule 1612)

☐ Nonbinding judicial arbitration under CCP 1141.2 (discovery to remain open until 30 days before trial: order required under CRC, rule 1612)

☐ Other

It is also stipulated that the arbitrator, mediator or other neutral shall be:

Name:

Date:

Name of Plaintiff

Signature

Name of Plaintiff's Attorney

Signature

Date:

Name of Defendant

Signature

Name of Defendant's Attorney

Signature

(Attach another sheet if additional names are necessary)
It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, rule 225.

**IT IS SO ORDERED. IT IS ALSO ORDERED** that no new parties may be added without leave of court and all unserved, non-appearing or actions by named parties are dismissed.

Date:

JUDGE OF THE SUPERIOR COURT

# EXHIBIT B

# CCC PSC Owner, LLC

**Ventana Grill**
**Percentage Rent Annual Stmt of Gross Revenues**
**For year 2023**

| | | |
|---|---|---|
| Gross Revenue | | $6,569,990.63 |
| | | |
| Less: | | |
| Sales tax | excluded from sales | |
| Tips | excluded from sales | |
| Refunds | | |
| Promo/charity meals | | |
| Employee meals - not to exceed 2% of gross | 28,422.98 | |
| VIP discounts | 19,835.00 | |
| General discounts | 64,119.56 | |
| Site fee | 15,200.00 | |
| Total deductions | | (127,577.54) |
| | | |
| Adjusted Gross Revenues | | $6,442,413.09 |
| | | |
| 6% of Adj. Gross Revenues | | $ 386,544.79 |
| Base Rent | | $ 172,296.75 |
| Difference | | $ (214,248.04) |
| Percentage Rent due* | | **$ 214,248.04** |
| Percentage Rent paid | | **$ 214,247.95** |
| Difference - Overpaid(Underpaid) | | **$ (0.09)** |

# EXHIBIT C

# CCC PSC Owner, LLC

**Ventana Grill**
**Percentage Rent Annual Stmt of Gross Revenues**
**For year 2024**

| | | |
|---|---|---|
| Gross Revenue | | $6,481,231.98 |
| | | |
| Less: | | |
| Sales tax | excluded from sales | |
| Tips | excluded from sales | |
| Refunds | | |
| Promo/charity meals | | |
| Employee meals - not to exceed 2% of gross | 34,465.19 | |
| VIP discounts | 20,074.11 | |
| General discounts | 55,281.68 | |
| Site fee | 18,200.00 | |
| Total deductions | | (128,020.98) |
| | | |
| Adjusted Gross Revenues | | $6,353,211.00 |
| | | |
| 6% of Adj. Gross Revenues | | $ 381,192.66 |
| Base Rent | | 177,465.68 |
| Difference | | $ (203,726.98) |
| Percentage Rent due* | | **$ 203,726.98** |
| Percentage Rent paid | | 203,726.95 |
| Difference - Overpaid(Underpaid) | | **$ (0.03)** |

# 2025.09.16 Pullan Decl. ISO Notice of Removal

Final Audit Report 2025-09-17

| | |
|---|---|
| Created: | 2025-09-16 |
| By: | Megan Schneider (mschneider@kfc.law) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA1ETfD5wFN-n2LM-U8qsEXK8zg2fDrcqf |

## "2025.09.16 Pullan Decl. ISO Notice of Removal" History

Document created by Megan Schneider (mschneider@kfc.law)
2025-09-16 - 10:50:24 PM GMT

Document emailed to ipullan@peregrinehg.com for signature
2025-09-16 - 10:51:08 PM GMT

Email viewed by ipullan@peregrinehg.com
2025-09-17 - 0:52:47 AM GMT

Signer ipullan@peregrinehg.com entered name at signing as Ian Pullan
2025-09-17 - 0:53:49 AM GMT

Document e-signed by Ian Pullan (ipullan@peregrinehg.com)
Signature Date: 2025-09-17 - 0:53:51 AM GMT - Time Source: server

Agreement completed.
2025-09-17 - 0:53:51 AM GMT